# ROOD v. COASTAL LUMBER COMPANY
## Case No. 84-1961
State of Florida, Division of Administrative Hearings

February 7, 1985

## APPEARANCES OF COUNSEL

**Larry K. White** for petitioner.

**Arthur C. Beal, Jr., Karl, McConnaughhay, Roland & Marda,** for respondent.

## OPINION

### RECOMMENDED ORDER

DIANE K. KIESLING, Hearing Officer.

Pursuant to notice, the Division of Administrative Hearings, by its duly designated Hearing Officer, Diane K. Kiesling, held a formal hearing in this case on November 8, 1984, in Tallahassee, Florida.

This issue is whether Coastal Lumber Company discriminated against William D. Rood, Jr. on account of his race in its failure to

promote him to plant superintendent and in its subsequent termination of employment.

The Petitioner, William D. Rood, Jr., (hereinafter Rood) presented the testimony of five witnesses: William D. Rood, Jr., David Carter, Jr., Dave Brown, Donald L. Hilburn and Lacy Stacker. Petitioner also introduced five exhibits which were admitted into evidence. The Respondent, Coastal Lumber Company (hereinafter Coastal) presented two witnesses, Gary Phillips and Leon L. Pinner, Jr., together with four exhibits. One of the exhibits was the deposition testimony of David D. Carter. The parties filed proposed findings of fact and conclusions of law as permitted by law. All proposed findings of fact and conclusions of law have been considered. To the extent that the proposed findings and conclusions submitted are in accordance with the Findings, Conclusions, and view submitted herein, they have been accepted and adopted in substance. Those findings not adopted are considered to be subordinate, cumulative, immaterial, unnecessary, or not supported by the credible evidence.[1]

## FINDINGS OF FACT

1. Rood is a black person.

2. Rood was employed by Coastal Lumber Company on June 22, 1981, as a glue line superintendent, where he supervised three shifts and three shift supervisors. In January, 1982, Rood was promoted to Dry End Superintendent, responsible for seven supervisors and three shifts.

3. Coastal Lumber Company operates a plywood production plant in Hinson, Florida. The plant has been in operation only since 1981 and produces plywood panels for use in the construction industry.

Plywood production is divided into several stages. The first stage is referred to as the Green End and involves stripping green logs straight from the forest by use of an industrial lathe. The lathe strips the logs into thin veneer sheets approximately 50 inches by 101 inches in size.

The veneer sheets are then transported to a huge oven where the sheets are dried out. Once the green veneer has had most of the water content removed in the oven, the sheets are placed on a conveyer belt

---

[1] Respondent did not number its Proposed Findings of Fact, making it impossible to identify the basis for rejection of certain proposed findings. Petitioner's Proposed Findings of Fact 1, 2, 9, 10, 13, 16, 19, 23, 32, 33, 37, 38, 39, 40, 41, 42 and 43 are adopted in substance. Petitioner's 3, 5, 7, 11, 12, 14, 15, 17, 18, 21, 24, 25, 26, 27, 28, 29, and 35 are modified; Petitioner's 4, 7, 20 and 22 are not supported by the credible evidence; and Petitioner's 30, 31, 34 and 36 are immaterial.

(the lay-up line). Glue is applied and the veneer sheets are placed one on top of the other like a sandwich to obtain the desired thickness. The multi-layer sheets are then pressed together in a large hydraulic press to cure the glue and bond the veneer sheets together to form a plywood panel.

After pressing, the rough-edged panels are squared off into standard size panels, sorted, graded and shipped. The production line beginning with the drying out process in the ovens through glueing and pressing process is referred to as the Dry End. The finishing and shipping department is a part of the Dry End in that the finished product has been dried in the oven, but is more typically referred to as a separate department.

4. David Carter was hired by Coastal Lumber as the plywood production manager in February 1982. He had previously been employed by the Union Camp Corporation as a plant manager and has twenty-five years of experience in the plywood industry.

Carter was hired because Coastal Lumber was in dire financial straits. The company had lost a lot of money in its first year of operation and was in danger of closing down. Production was down, costs were out of control and the plant was lacking in leadership.

5. When he arrived at Coastal Lumber, Carter found the plant organized in a departmental superintendent system. Warren Thornton, a black man, was the Green End superintendent. Rood was the Dry End superintendent. John Asbell, a white man, was the Finishing and Shipping superintendent. Under the system, the three superintendents were of equal authority and were responsible for scheduling and coordinating production between their departments. Carter had worked before in plants which used this departmental superintendent system but based on his many years of experience preferred a system utilizing a single plant superintendent who is responsible for scheduling production throughout the plant.

6. In order to increase production and turn the plant around, Carter began making changes. First, he fired John Asbell because Asbell was unable to improve the finishing and shipping department. He then transferred Mike Leonard, a black employee, from the glue line to the finishing and shipping department because Leonard had some prior experience in the area. Rood, who had previously supervised Leonard on the glue line, was required to assume superintendent responsibilities for the finishing and shipping department in addition to his responsibilities as dry end superintendent. Both of these personnel moves were on a trial basis.

171

7. Although some improvement occurred in the finishing and shipping department under Rood's supervision, the improvement was not satisfactory in light of the serious financial condition of the company. Production had not improved sufficiently, housekeeping and maintenance was not up to par and the manufacture of specialty items was requiring too much personal involvement by Carter due to Rood's inexperience.

8. Having exhausted internal efforts at increasing production in the finishing and shipping department, Carter hired Leon Pinner from outside the company as the finishing and shipping supervisor. Pinner had over one and one-half years experience in the finishing and shipping department with International Paper Company and had been directly involved in the production of speciality items. He had also worked as assistant plant superintendent, plant superintendent and plant manager while employed with Georgia Pacific.

9. For several weeks Pinner worked under Rood's supervision but Carter relieved Rood of any supervisory responsibilities in the finishing and shipping department shortly after Pinner's arrival. Within four weeks or so after Pinner's arrival, the finishing and shipping department was up to production, housekeeping was in order and Carter was tremendously impressed with Pinner's performance.

10. Shortly thereafter Carter, along with his immediate boss—J.T. Woods, elected to switch to a plant superintendent organization scheme for the plywood plant. This reorganization resulted in the elimination of the three department superintendent positions, although as a practical matter two of the positions were vacant at of the time of reorganization.

11. Woods and Carter considered three candidates for the position of plant superintendent—Warren Thornton, Bill Rood and Leon Pinner. There was no advertisement or announcement that Coastal was seeking a plant superintendent. Based on Pinner's superior performance in straightening out the finishing and shipping department, Pinner's experience in the industry and Rood's inability to straighten out the finishing and shipping department, Pinner was promoted to the positon of plant superintendent.

12. Rood completed 3½ years of college credits. He was first hired in the plywood industry in 1966. He has worked as a foreman, a supervisor, Dry End Superintendent, and plant superintendent. He has a total of 14½ years of supervisory experience at the different levels of responsibility.

13. Pinner began in the plywood industry in 1967. In addition to

**172**

various line positions, he has served as supervisor in the glue line, drier and finishing and shipping and as assistant plant superintendent, plant superintendent and plant manager.

14. Carter and Pinner discussed how the reorganization was to be handled and what was to be done with Bill Rood's position as Dry End Superintendent. Rood's position was eliminated and he was transferred to day shift glue line supervisor, without a pay cut. His new position was equivalent to that held by any other supervisor and he no longer had the authority to exercise any supervision over the other supervisors.

15. On June 18, 1982, Pinner called a production supervisors' meeting to advise the supervisors of the reorganization. Rood was present at the meeting. Pinner advised Rood that his position had been eliminated and that he was placed in the position of dry shift glue line supervisor. He was advised that the change was effective immediately. Pinner also advised all supervisors to pull maintenance while the plant was shut down. Pinner gave strict instructions that all supervisors, including Rood, were to be present on June 20, 1982, to perform maintenance.

16. Rood was advised to run his day shift on June 19, 1982, after which the plant would shut down for maintenance.

17. Following this meeting, Rood no longer had supervisor authority over the other supervisors and no longer had the authority or latitude of a superintendent.

18. On Sunday, June 20, 1982, Rood showed up at the plant and instructed the other two supervisors in the glue line as to what maintenance needed to be done. Rood then left the plant and did not return. Rood performed no actual maintenance work himself. He did not ask permission to leave of either Pinner or Carter, both of whom were present at the plant themselves performing maintenance.

19. The next day, June 21, 1982, Pinner terminated Rood. Carter concurred in this decision. The decision to terminate Rood was based on several reasons. First, Rood had disobeyed a direct order from the plant superintendent, an order which had been given in the presence of other supervisors. Second, Rood had left without asking permission. As an on-line supervisor, like all other supervisors, Rood could not come and go as he pleased. Although, while he was the Dry End superintendent, Rood had necessarily worked at various times (due to the responsibility of having to oversee all shifts in his department), he no longer had such flexibility and was required to be at the plant specific times for a specific shift. He was required to help with maintenance on

173

Sunday just like every other supervisor (including the plant superintendent and plant manager—Pinner and Carter). He failed to do so. Third, his failure to pull maintenance despite direct orders set a bad example for other supervisory personnel, some of who had legitimate reasons for needing June 20 off.

20. At various times Coastal has had problems with other employees, both black and white. No other employee had been terminated on the first instance of absence from work without permission. Infractions by others were dealt with first by warnings or suspensions. Termination did occur with both black and white employees.

21. Rood was treated differently because all of this took place during a critical period for the plant when everyone's cooperation was imperative. In this regard, Rood's situation is clearly distinguishable from that of other employees, both black and white, whose jobs had been terminated only after several instances of tardiness because of his prior position and the dire circumstances of the company. Mr. Rood was not fired because he is black.

22. After his termination, Coastal Lumber offered Rood the same opportunity it typically offered supervisory personnel that were fired or quit: he was offered a hourly job as a core layer with the opportunity to work his way back up into a supervisory position. This opportunity was administered equally to both black and white workers (for example, Lacy Stacker and David Brown).

Had Rood accepted the core layer job at $6.00 per hour and proved himself capable of good job performance, he probably would have reassumed a supervisory role within a month or so, as did Stacker and Brown.

23. Rood made reasonable attempts to secure other employment, but remained unemployed from June 21, 1982 until January, 1983. During that period he collected $2,630.00 as unemployment compensation.

24. At the time of his termination, Rood was paid $2,530.00 per month. In January, 1983, he was hired by Boise Cascade Lumber Company in South Carolina with an annual salary of $20,901.00. In May, 1984, Rood was promoted to a supervisory position and received a pay increase to $27,000.00 per year.

25. Rood lost income of $15,180.00 during 1982, $9,459.00 in 1983 and $5,845.00 from January 1, 1984 until November 1, 1984. The total lost wages for this period was $30,484.00. Rood continues to make $380.00 less per month than while employed by Coastal.

174

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction of the parties to and the subject matter of this action. Section 120.56(1), Florida Statutes (1983).

The Human Rights Act of 1977, Section 760.01 et seq., Fla. Stat. (1983), prohibits unfair employment practices discriminatory "with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin, age, handicap, or marital status." Section 760.10(1)(a), Florida Statutes (1983).

Florida's employment discrimination statute is patterned on or similar to Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e, et seq.

In cases similar to the present one, the United States Supreme Court has established the burden of proof which a plaintiff claiming employment discrimination must meet in order to be entitled to relief.

In order to carry the burden of proving a prima facie case, the plaintiff must show that he applied for an available position for which he was qualified, but that he was rejected under circumstances giving rise to an inference of unlawful discrimination. In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court set the standard of proof. In that case, the Court ruled that a plaintiff claiming racial discrimination must show: (1) that he belongs to a racial minority; (2) that he applied and was qualified for the job for which the employer was seeking applicants; (3) that he was rejected despite qualifications; and (4) that after rejection, the position remained open and the employer continued to seek applicants with plaintiff's qualifications. 411 U.S. at 802. See also *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207, 215 (1981), aff'd, 647 F.2d 573 (5th Cir. 1981).

If the plaintiff establishes a prima facie case of employment discrimination, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for rejecting the plaintiff. If the employer carries this burden, the burden shifts back to the plaintiff to prove that the legitimate reasons offered by the employer were pretextual. *McDonnell Douglas*, 411 U.S. at 804; *Burdine*, 450 U.S. at 256.

It is concluded that in the present case Rood established a prima facie case in that: (1) He belongs to a protected class (a racial minority); (2) He was considered for and was qualified for the job; (3) He was not hired; and (4) A white was hired for the job who had less experience and less seniority. It is here noted, however, that both Rood

and Pinner had adequate experience and both qualified for the job. Based on this showing, the burden shifts to Coastal to show a legitimate, non-discriminatory reason for hiring Pinner as plant superintendent instead of Rood.

Coastal has shown legitimate, non-discriminatory reasons for the decision to make Pinner plant superintendent. Pinner's promotion was based on his experience in the plywood industry, his demonstration of initiative and his superior performance in straightening out the problems in the Finishing and Shipping Department. Rood was unable to straighten out the Finishing and Shipping Department and lacked experience and knowledge in processing of specialty items. It is concluded that Coastal has shown legitimate, non-discriminatory reasons for its hiring or promotion decision.

The burden shifts back to Rood to show that these reasons are pretextual. To do this, Rood must show by a preponderance of the evidence that the reasons offered are a pretext to cloak intentional discrimination. He may succeed by "directly showing that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's preferred explanation is unworth of credence." *Burdine*, 450 U.S. at 256.

It is concluded that Rood has failed to carry this final burden of persuasion. The reasons given by Coastal for the decision to make Pinner plant superintendent are entirely credible and were not motivated by Rood's race. Pinner did, in fact, merit the promotion based on his job performance in the Finishing and Shipping Department in solving problems Rood was unable to solve and based on his superior knowledge and experience in processing of speciality items.

As to the termination of Rood, Rood again carried his burden of proving a prima facie case, although this was a much closer question. However, Coastal has clearly articulated legitimate, non-discriminatory reasons for the termination. Rood was terminated as business necessity based on the magnitude of his infraction and the severity of the possible consequences to the authority of the plant superintendent and plant manager and to the moral of other supervisory employees. Rood disobeyed instructions that were clearly articulated and which were necessitated by the dire financial condition of the plant.

Here again, Rood did not carry his burden of showing that the reasons for the termination were pretextual. The reasons articulated were not motivated by discriminatory intent and they were worthy of credence.

It is concluded that Rood has failed to carry his ultimate burden of

176

persuasion and that Coastal has clearly articulated legitimate, non-discriminatory reason for its actions both as to hiring of the plant superintendent and as to terminating Rood. Coastal has not violated the Human Rights Act of 1977 and has not engaged in unfair or discriminatory employment practices in regard to Rood.

## RECOMMENDATION

Based upon the foregoing findings of fact and conclusions of law, it is

RECOMMENDED:

That the complaint of William D. Rood, Jr., be DISMISSED and that the Prayer for Relief be DENIED.